MICHIGAN PUBLIC SERVICE COMPANY v. CITY
OF CHEBOYGAN.

BLANCHARD v. SAME.

1. CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACTS—CONSTRUCTION OF CONSTITUTIONS.

Unless carrying upon their face an intention to be retrospective, constitutional provisions, as well as legislative enactments, must be held prospective in operation only, and may not be held retrospective so as to impair the obligation of contracts.

2. SAME—ABROGATION OF PREVIOUSLY-ENACTED STATUTE.

An enactment relative to the transmission and distribution of electricity over public municipal streets which is contrary to a subsequently-adopted Constitution is abrogated by the latter (Const 1908, art. 8, § 28; Act No. 264, Pub. Acts 1905).

3. ELECTRICITY—STATE FRANCHISE AS TO USE OF STREETS—CITY FRANCHISE.

Upon the renewal of the charter of a corporation, organized under an act which, as it stood at the time of renewal, authorized the corporation to manufacture and distribute electricity to persons and corporations for light, heat and power purposes and which then was, pursuant to statute enacted in 1905, by virtue of the character of its business, granted by the State a right to use the public streets, alleys, and highways for the maintenance of poles and wires, the corporation was not required to disclaim user of such places for such purpose pursuant to a franchise by a city nor make an election between the State or city franchise (Act No. 264, Pub. Acts 1905).

REFERENCES FOR POINTS IN HEADNOTES

[1] 11 Am. Jur., Constitutional Law, § 35; 12 Am. Jur., Constitutional Law, § 396; 50 Am. Jur., Statutes, § 478.
[2] 11 Am. Jur., Constitutional Law, § 86.
[3, 4] 18 Am. Jur., Electricity, §§ 7–10, 16, 17, 27.
[5, 7] 18 Am. Jur., Electricity, §§ 9, 13–15; 38 Am. Jur., Municipal Corporations, §§ 524, 536–539, 542, 543, 549–551.

Footnote references continued on next page.

4. SAME—FRANCHISES—STATE—CITY.

Under the Constitution of 1850, the grant by the State to a corporation, authorized to maintain electrical service, of a franchise to use the public streets, alleys, and highways for an unspecified number of years is broader in scope, both as to term and territory, than a city ordinance granting to the same corporation a franchise for such purpose for a period of 30 years, but the two are not inconsistent since the city acquired such power as it then had by virtue of legislative grant (Act No. 264, Pub. Acts 1905; Act No. 510, Local Acts 1905).

5. SAME—CONTRACTS—STATE FRANCHISE.

The acquisition of the right to the use of public streets, alleys, and highways by a corporation engaged in manufacturing

[5, 7] Grant of perpetual franchise to public service corporation. 2 A.L.R. 1111.

[5, 7] Duration of street franchise without fixed term, beyond the life of the grantee. 71 A.L.R. 121.

[8] 38 Am Jur., Municipal Corporations, § 540.

[9, 10] 18 Am. Jur., Electricity, § 36 et seq.; 38 Am. Jur., Municipal Corporations, § 567.

[9, 10] What are "public utilities" within constitutional or statutory provisions relating to purchase, construction, or repair of same by municipal corporations. 35 A.L.R. 592.

[9, 10] Power of municipality to sell, lease, or mortgage municipal waterworks, gas or electric-light plant, or interest therein. 39 A.L.R 216.

[11] 37 Am. Jur., Municipal Corporations, § 19; 38 Am. Jur., Municipal Corporations, § 567; 43 Am. Jur., Public Securities and Obligations, §§ 71, 76, 81.

[13] 37 Am. Jur., Municipal Corporations, §§ 104, 105.

[14–17] 37 Am. Jur., Municipal Corporations, § 19; 43 Am. Jur., Public Securities and Obligations, §§ 76, 77, 91, 92

[19] 43 Am. Jur., Public Securities and Obligations, § 265.

[19] Right to call governmental bonds in advance of their maturity. 109 A.L.R. 988.

[21] 37 Am. Jur., Municipal Corporations, § 151.

[22, 26] 43 Am. Jur., Public Securities and Obligations, § 88.

[22, 26] Effect of inclusion in call for election, or in proposal for bond issue submitted to people, of unauthorized method of payment or retirement. 93 A.L.R. 362.

[22, 26] Mistake, ambiguity, or omission in statement as to indebtedness, in call for election or proposal for bond issue, as affecting validity of election or bonds issued pursuant thereto. 116 A.L.R. 1258.

[23, 24] 43 Am. Jur., Public Securities and Obligations, § 81 et seq.

[23, 24] Statutory provision as to manner and time of notice of special election as mandatory or directory. 119 A.L.R. 661.

[25] 43 Am. Jur, Public Securities and Obligations, § 93.

[27] 14 Am. Jur., Costs, §§ 23, 91.

and distributing electricity under a State statute enacted in 1905 was a contract right which remains in force to the end of the contract period and which was not subject to abrogation by the legislature, new Constitution, or the court (Const. 1908, art. 8, § 28; Act No. 264, Pub. Acts 1905; Act No. 510, Local Acts 1905).

6. CONSTITUTIONAL LAW — ELECTRICITY — FRANCHISES — VESTED RIGHTS.

The grant by ordinance to a corporation of the right to occupy streets and alleys of a city for the purpose of supplying electricity to a municipality and its inhabitants is a grant of a property right, and is within the protection of the Federal Constitution, since, if the franchise is accepted by carrying out the contemplated undertaking and the expenditure of large sums of money, it must be held to be contractual in nature and to result in vested rights.

7. CORPORATIONS — FRANCHISES — MUNICIPAL CORPORATIONS — HIGHWAYS AND STREETS.

Corporation to which had been granted a franchise to use the streets, alleys and highways of a city for the transmission and distribution of electricity by a State statute and by virtue of a franchise granted to it by a city and had expended large sums of money in constructing transmission lines for such purpose, acquired a right to use the streets and alleys of the city for its poles and wires during the continuation of its corporate life, including any extensions thereof (Act No. 264, Pub. Acts 1905).

8. SAME—ELECTRICITY—FRANCHISE.

The right of a corporation to use the streets and alleys of a city pursuant to a franchise granted to it by a State statute is not an exclusive right (Act No. 264, Pub. Acts 1905).

9. MUNICIPAL CORPORATIONS—CONSTITUTIONAL AUTHORIZATION—PUBLIC UTILITIES—REVENUE BONDS—STATUTES.

The constitutional authorization of municipal utilities does not, alone, give a municipality the power to purchase a public utility and issue proposed revenue bonds, observance of general statutes implementing such power being also required (Const. 1908, art. 8, §§ 23–25).

10. SAME—CHARTERS—ACQUISITION OF ELECTRIC-LIGHT PLANT AND SYSTEM.

In order that a city may acquire an electric-light plant and system and issue revenue bonds, the charter must have specific provision therefor.

11. SAME—CHARTERS—AMENDMENT—ELECTRIC-LIGHT  PLANT  AND SYSTEM—ELECTIONS.

A city may submit an amendment to its charter to the electors to authorize the purchase of an electric-light plant and system and at the same election submit to the electorate a proposition to make a particular contract within the scope of the proposed amendment.

12. APPEAL AND ERROR—BRIEFS—STATEMENT OF QUESTIONS INVOLVED —ARGUMENT.

The questions stated in the statement of questions involved at the beginning of an appellant's brief are to be used in the same order as topical subheadings throughout the argument (Court Rule No. 67, § 1 [1945]).

13. MUNICIPAL CORPORATIONS—AMENDMENT OF CHARTER.

Under the home-rule act, any existing city charter, whether passed pursuant to the home-rule act or granted or passed by the legislature for the government of a city may be amended by submitting the proposed amendment to the electorate (1 Comp. Laws 1929, § 2257, as amended by Act No. 279, Pub. Acts 1939).

14. SAME—AMENDMENT OF CHARTER—SEPARATION OF PROPOSITIONS.

When a city charter is to be amended, the proposed amendment must be confined to one subject and in case a subject should embrace more than one related proposition, each proposition must be separately stated to afford an opportunity for an elector to vote for or against each proposition (1 Comp. Laws 1929, § 2257, as amended by Act No. 279, Pub. Acts 1939).

15. SAME—AMENDMENT OF CITY CHARTER—RELATED PROPOSALS.

Resolution of city council proposing amendments to the city charter for the purpose of empowering the city to own, operate and acquire by purchase or condemnation of private property for public use, of any electric generating plant and/or distributing system, as one proposal, and to amend the charter to authorize the issuance of mortgage bonds beyond the general limit of bonded indebtedness prescribed by law, payable solely from revenues, as a second proposal, was in accord with the statute relative to submission of charter amendments as the proposals were related and yet separated for purposes of approval by the electorate (1 Comp. Laws 1929, § 2257, as amended by Act No. 279, Pub. Acts 1939).

16. SAME—ACQUISITION OF UTILITY—PURCHASE—CONDEMNATION.

In submitting the matter of acquiring an electric-light plant for a city to the voters thereof, the inclusion of both the purchase and condemnation of property for such purpose in one proposal does not invalidate an election since the electors need not be required to approve the precise method of acquisition, either method being commonly employed.

17. SAME—REVENUE BONDS—FRANCHISE TO OPERATE UTILITY IN CASE OF DEFAULT.

Fact that authority to issue revenue bonds and the granting of a 20-year franchise to operate an electric plant and distribution system as security for the payment of the mortgage bonds in case of default were contained in the same section of a resolution does not provide for two separate and unrelated propositions in view of provisions in both the Constitution and pertinent statute requiring the franchise for security (Const. 1908, art. 8, § 24; 1 Comp. Laws 1929, § 2233).

18. SAME—MUNICIPAL UTILITY—MORTGAGE—FRANCHISE.

A franchise incident to mortgage bonds on a municipal utility must be granted *in praesenti* by the electorate to become operative in event of foreclosure of the mortgage and be irrevocable by the municipality during the period fixed for its duration, the franchise being a part of the security required by the Constitution to be incorporated in the mortgage (Const. 1908, art. 8, § 24; 1 Comp. Laws 1929, § 2233).

19. SAME—MORTGAGE BONDS ON MUNICIPAL UTILITY—CALLING BEFORE MATURITY.

Whether or not mortgage bonds on a municipal utility may be called before maturity, not having been prohibited by statute, is impliedly left to the discretion of the issuing authority (1 Comp. Laws 1929, § 2233).

20. SAME—EFFECTIVE DATE OF CHARTER AMENDMENT.

Fact that resolution submitting a charter amendment to vote purported to give the amendment immediate effect would not be sufficient ground to invalidate the result of the election, where although such provision as to effective date may not be in accord with the statute, providing that amendment would be effective when filed with the secretary of State and the county clerk within 30 days after the vote was taken unless a different date is specifically set forth within the amendment, the error was harmless and now moot (1 Comp.

Laws 1929, § 2260, as amended by Act No. 175, Pub. Acts 1941).

21. Same—Proceedings of Common Council—Publication.

Electors of a city are presumed to have notice of the proceedings of the common council, which are published in the official paper of the corporation.

22. Same—Amendment of Charter—Form of Ballot—Inconsistent Provisions of Charter.

Where the form in which proposed amendments to city charter were to be submitted on the ballots was comprehensive and not misleading, the election will not be invalidated because of failure to detail in the resolution providing for submission, what, if any, other provisions of the charter might be inconsistent therewith and therefore repealed.

23. Same—Elections—Notices.

Notice of election giving time, place and hours of submission for electorate's approval of amendment to city charter *held*, sufficient.

24. Same—Elections—Irregularities.

Fact that notice of special election as to charter amendment and matter of acquiring a public utility by city designated hours for opening of polls as those provided by State law for general elections instead for those provided by the city charter for city elections; that polling places were designated by the city clerk and not by the city council as provided by the city charter for city elections; that the wording of the proposals in the notice was not the same language as used in the resolutions; and that the notice of election did not contain the full text of the resolutions *held*, insufficient to invalidate an election of which there was proper publication and which was held at the same time as the State general election, especially where it is not shown that any elector was misled or hindered in his voting by reason of any of the claimed irregularities.

25. Elections—Construction of Statutes.

Statutes giving directions as to the mode and manner of conducting elections will be construed by the courts after election as directory, unless a noncompliance with their terms is expressly declared to be fatal, or will change or render doubtful the result, although before election such statutes will be construed as mandatory if direct proceedings for enforcement are brought.

26. SAME—PHRASE "AND/OR" IN PROPOSITION.

While the use of the phrase "and/or" in the submission of a proposition to an electorate for approval is to be quite generally condemned as a verbal monstrosity tending to confuse and mislead, the election will not be declared a nullity because of its use where its use does not appear to have had such confusing or misleading effect and the question is not raised until after the election.

27. COSTS—PUBLIC QUESTION—QUO WARRANTO—INJUNCTION.

No costs are awarded in consolidated case involving suit to enjoin city from acquiring an electric-light generating plant or distributing system and issuing mortgage bonds payable from revenues and quo warranto proceeding to determine validity of an election, a public question being involved.

Appeal from Cheboygan; Callender (Sherman D.), J., presiding. Submitted January 4, 1949. (Docket Nos. 11, 12, Calendar Nos. 43,989, 44,074.) Decided April 11, 1949.

Bill by Michigan Public Service Company, a Michigan corporation, against City of Cheboygan and others to restrain defendant and its officers from acquiring an electric-light generating plant and/or distributing system and issuing of mortgage bonds.

Quo warranto by John D. Blanchard and another against City of Cheboygan to test validity of election at which question of acquiring electric generating plant and issuing of mortgage bonds was decided.

Decree for defendants in chancery case and judgment for defendant in quo warranto. Plaintiffs appeal. Affirmed.

*K. B. Matthews* (*Fitch R. Williams,* of counsel), for plaintiffs.

*John A. Cain* (*Benjamin V. Halstead,* of counsel), for defendants.

BOYLES, J. This appeal involves two cases which were consolidated for hearing in the circuit court, and have been submitted here on consolidated record and briefs. On November 15, 1946, appellant Michigan Public Service Company filed a bill of complaint in the circuit court for Cheboygan county in chancery against the city of Cheboygan, its mayor and aldermen, to enjoin the defendants from taking any steps toward acquiring, operating or maintaining a municipal electric generating plant or distribution system for supplying the city and its inhabitants with electricity, and from issuing any mortgage bonds for such purposes based upon a certain election, which appellants claim is void.

The principal question of law involved in said chancery case is whether the plaintiff Michigan Public Service Company itself has any right to use the streets and alleys of the city of Cheboygan for its poles and wires to transmit and distribute electrical energy. Inasmuch as said corporate plaintiff now has no franchise from the municipality (such franchise having expired in 1943), the right of said plaintiff to maintain this suit in chancery against the defendants might partly depend upon whether it has any right to occupy the streets and alleys of the city with its poles and wires. For that reason, the chancery matter will be considered first in this opinion. No question has been raised here as to the joinder of the chancery case with a quo warranto case for purpose of appeal, and all parties to the appeal have joined in requesting this Court to consider and decide the issues presented here in the consolidated cases. The underlying facts and circumstances in the chancery case are interwoven with the problems presented in a quo warranto proceeding, likewise attacking the validity of said election.

At the time the chancery case was instituted by the corporate plaintiff, the 2 individual appellants, on leave granted by the court, filed a petition in the nature of quo warranto in said court directly attacking the legality of the election, the validity of which the plaintiff corporation challenges in the chancery case. The 2 plaintiffs in the quo warranto proceeding are citizens, electors and taxpayers of the defendant city of Cheboygan. One of them, John D. Blanchard, is a stockholder of the corporate plaintiff, Michigan Public Service Company. Their petition in the nature of quo warranto asks that the defendants be required to answer by what right they claim any authority to acquire and maintain a municipal electric plant. The defendants in their answer claim that right by virtue of said election, and that the election is not invalid.

In the lower court separate answers were filed. The 2 cases were heard on 1 record which here consists of 1,366 pages of pleadings, testimony, exhibits, findings, the opinion, the judgment and decree of the trial court. On October 27, 1947, the court entered an order upholding the election, the legality of which was challenged in both cases, and dismissed the information filed in the quo warranto case. On December 29, 1947, the court entered a decree in the chancery case reciting that, inasmuch as no compromise settlement had been reached subsequent to the entry of the order dismissing the quo warranto case, the bill of complaint in the chancery case was thereby also dismissed. From these two final orders the plaintiffs in both cases have appealed. Not to be considered as establishing a precedent, but to avoid a multiplicity of suits and appeals, we consider the issues involved in both matters.

*Chancery Case.* The appellant Michigan Public Service Company is a Michigan corporation engaged in the production, distribution and sale of electrical

energy in various counties, including Cheboygan. The corporate predecessor of appellant Michigan Public Service Company was incorporated in 1896 under the name Cheboygan Electric Light & Power Company. By amendment to its articles the corporate name was changed to Michigan Public Service Company in 1923. In 1926, articles were filed extending its corporate existence for 30 years. In 1927, by a merger agreement and articles filed, the company became possessed of all of the rights and powers of 7 constituent corporations, one of which was Michigan Public Service Company, formerly the Cheboygan Electric Light & Power Company. By the articles then filed, the corporate life of the appellant company was extended to 1957.

The Cheboygan Electric Light & Power Company began supplying electrical energy to the city of Cheboygan and its inhabitants (apparently without a franchise) shortly after 1900. Said corporation under its own name and later its successor, the Michigan Public Service Company, have continuously served the city of Cheboygan and its inhabitants with electrical energy. Hereinafter in this opinion, wherever reference is made to the "corporate plaintiff," it is intended to include its corporate predecessor, the Cheboygan Electric Light & Power Company.

On March 7, 1904, the city of Cheboygan granted to Cheboygan Electric Light & Power Company a franchise. On January 9, 1913, another franchise was granted to said company. This franchise, as well as the former one, has now expired. However, the present corporate plaintiff claims a perpetual right to use the streets and alleys of said city for its poles and wires by virtue of its having occupied the city streets and having been engaged in the business of supplying electricity in the city prior to the adoption of the 1908 Constitution, and under and

by virtue of Act No. 264, Pub. Acts 1905, and Act No. 510, Local Acts 1905.

In 1905, and at the time when the Cheboygan Electric Light & Power Company was occupying the city streets and alleys with its poles and wires, the legislature passed two pertinent acts. Act No. 264, Pub. Acts 1905 (1 Comp. Laws 1915, § 4841),* was as follows:

"AN ACT to authorize under certain conditions and restrictions the use of public streets, alleys and highways by persons, firms or corporations engaged in the manufacture, transmission and distribution of electricity for lighting, heating and power purposes.

"*The People of the State of Michigan enact:*

"Section 1. Any person, firm or corporation authorized by the laws of this State to conduct the business of producing and supplying electricity for purposes of lighting, heating and power, and which shall be engaged or which shall hereafter desire to engage in the business of the transmission of such electricity, shall have the right to construct and maintain lines of poles and wires for use in the transmission and distribution of electricity on, along or across any public streets, alleys and highways and over, under or across any of the waters of this State, and to construct and maintain in any such public streets, alleys or highways all such erections and appliances as shall be necessary to transform, convert and apply such electricity to the purposes of lighting, heating and power, and to distribute and deliver the same to the persons, firms and public or private corporations using the same: *Provided,* That the same shall not injuriously interfere with other public uses of such streets, alleys or highways, or with the navigation of said waters, and that the designation and location of all lines of poles and wires shall be subject to the regulation, direction and

---

* Later expressly repealed by Act No. 309, Pub. Acts 1929 (1 Comp. Laws 1929, § 121, par. 3, p. 334).

approval of the common council of cities, the village council of villages, and the township board of townships, as the case may be: *Provided,* That this act shall not apply to the county of Wayne: *Provided further,* That nothing herein shall deprive cities, villages or townships of the power and control over their .streets and highways, which they have by the general laws of this State."

Act No. 510, Local Acts 1905, was, for the purposes of this case, similar to said Act No. 264, Pub. Acts 1905, except that it applied only in the counties of Emmet and Cheboygan. It apparently matters not on which of these two acts the corporate plaintiff relies, inasmuch as its claimed right to construct and maintain poles and wires for transmission of electricity on or across the public streets and alleys of the defendant city might be considered to be based upon either one of the two acts. Both of these acts were abrogated by the Michigan Constitution (1908) when it went into effect January 1, 1909. However, if the right of the corporate plaintiff to use the streets and alleys of the city to construct and maintain poles and wires for use in the transmission of electricity became a vested right before January 1, 1909, such rights were not then terminated.

"The legislature has not repealed the act of 1905 (Act No. 264). It is claimed that the act of 1905 has been abrogated or repealed by section 28, art. 8, of the Constitution of [*sic*] 1909 (1908), which provides:

" 'No person, partnership, association or corporation operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any city, village or township for wires, poles, pipes, tracks or conduits, without the consent of the duly constituted authorities of such city, village or township; nor to transact a local business therein without first obtaining a franchise therefor from such city, village or township. The

right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships.' ·

"This provision of the Constitution is a wise and radical change in the policy of exercising the sovereign power over the streets, and upon its adoption it at once superseded the act of 1905 and rendered that act from that time inoperative.

"The Constitution of [*sic*] 1909 (1908) did not revoke and terminate existing user of the streets under Act 264 of 1905. The Constitution did abrogate the law of 1905, but it did not and could not revoke existing contracts under that act arising out of beneficial user of the streets for public utility purposes.

"Constitutional provisions, as well as legislative enactments, must be held prospective in operation only, unless they carry upon their face an intention to be retrospective.

"It would not help, however, to hold the constitutional provision retrospective, for the reason that contract rights are not subject to impairment by later constitutional provisions any more than by legislative enactments." *City of Lansing* v. *Michigan Power Co.*, 183 Mich. 400, 408.

The appellees here claim that the corporate plaintiff's predecessor was *not* using the streets and alleys of the city for its poles and wires to transmit electricity on, over and across the city streets and alleys *by virtue of Act No. 264, Pub. Acts 1905,* but on the contrary was exercising that right by virtue of the franchise granted to it *by the city* in 1904. In fact, the circuit judge based his conclusion that the corporate plaintiff no longer had any right to use the city streets and alleys, on the theory that the company had not *elected* to use the streets and alleys by virtue of Act No. 264, Pub. Acts 1905, had not surrendered its city franchise of 1904, and by

accepting a new franchise in 1913 had *elected* to occupy the city streets and alleys exclusively by virtue of its city franchise rights and not by virtue of Act No. 264, Pub. Acts 1905. In its opinion the trial court said:

"The company, after adoption by the people of the Constitution of 1908, did not, at any time, elect to surrender its city franchise and to operate exclusively by virtue of the franchises granted by the State of Michigan under acts adopted in 1905, and abrogated by the new Constitution. Instead, the company continued as before to operate under the city franchises of March 7, 1904, and the new franchise sought and obtained from the city by the company on January 9, 1913, up to and including January 7, 1943. * * * The city franchise granted in January, 1913, expired in January, 1943, and no new franchise, or exclusive operating rights, have at any time been granted to the company by the city, State, or other public body since that date, January of 1943, and it is the opinion of this court that the rights of the company as to the occupancy of the streets of the city of Cheboygan are only such equitable rights as arise from the conduct of the respective parties over a long period of years, and that those rights may best be determined by cooperation and contract within the authorities and terms of the franchise ordinance adopted by the people of the city of Cheboygan at the November election of 1946."

In that, the court was in error. At no time was the company required to *elect* as to whether it was occupying the city streets and alleys in pursuance of Act No. 264, Pub. Acts 1905, or in pursuance of a municipal franchise.

"Upon the renewal of the charter of a corporation, organized under an act which, as amended prior to time of renewal, authorized the corporation to manufacture and distribute electricity to persons and corporations for light, heat and power purposes

and which then, pursuant to statute enacted in 1905, was, by virtue of the character of its business, granted by the State a right to use the public streets, alleys, and highways for the maintenance of poles and wires, the corporation was not required to disclaim user of such places for such purpose pursuant to a franchise by a village nor make an election between the State or village franchise (Act No. 411, Pub. Acts 1867, as amended by Act No. 49, Pub. Acts 1897, and Act. No. 307, Local Acts 1903; Act No. 264, Pub. Acts 1905).

"Under the Constitution of 1850, the grant by the State to a corporation authorized to maintain electrical service of a franchise to use the public streets, alleys, and highways for an unspecified number of years is broader in scope, both as to term and territory, than a village ordinance granting to the same corporation a franchise for such purpose for a period of 30 years, but the two are not inconsistent since the village acquired such power as it then had by virtue of legislative grant (Act No. 411, Pub. Acts 1867, as amended by Act No. 49, Pub. Acts 1897, and Act No. 307, Local Acts 1903; Act No. 264, Pub. Acts 1905).

"The acquisition of the right to the use of public streets, alleys, and highways by a corporation engaged in manufacturing and distributing electricity under a State statute enacted in 1905 was a contract right which remains in force to the end of the contract period and which was not subject to abrogation by the legislature, new Constitution, or the court (Const. 1908; Act No. 411, Pub. Acts 1867, as amended by Act No. 49, Pub. Acts 1897, and Act No. 307, Local Acts 1903; Act No. 264, Pub. Acts 1905)." *Village of Constantine* v. *Michigan Gas & Electric Co.* (syllabi), 296 Mich. 719.

"Grant by ordinance to corporation of right to occupy streets and alleys of city for purpose of supplying gas to municipality and its inhabitants is

grant of property right, and is within protection of the Federal Constitution.    *    *    *

"Franchise accepted by carrying out contemplated undertaking, incident to which large sums of money are expended, must be held to be contractual in nature and to result in vested rights." *City of Benton Harbor* v. *Michigan Fuel & Light Co.* (*syllabi*), 250 Mich. 614 (71 A. L. R. 114).

The right of the Michigan Public Service Company to use the streets and alleys of the city of Cheboygan for its poles and wires to transmit and distribute electrical energy stems from Act No. 264, Pub. Acts 1905, is a vested right, comes within the above decisions, and is preserved thereby. The circuit judge was in error in holding that the corporate plaintiff has no franchise right from the State of Michigan to use the streets and alleys of the city of Cheboygan for its poles and wires. Under the admitted facts in this case, the company's corporate predecessor was making such use of the city streets and alleys in 1904 at which time it obtained a franchise from the city of Cheboygan for that purpose. At the same time the company, by amendment to its articles, increased the capital of the company from $100,000 to $200,000, enlarged the corporate powers, provided authority to mortgage its lands or personal property and issue bonds, own or lease the necessary land for construction and maintenance of plants for the development of steam power or water power. In their brief the appellees concede that these happenings in March, 1904, made it clear that by that time the company had used up its original capital of $100,000 in constructing its plant and facilities and that it had decided upon improvements and extensions which required additional capital; it is conceded that the enlarging of its corporate powers with authority to mortgage property and issue bonds to provide increased capital was manifestly

in contemplation of extensions and improvements. The appellees claim that there is nothing to indicate that the company made substantial capital investments after the effective date of Act No. 264, Pub. Acts 1905, and between that time and January 1, 1909, when said act was nullified by the Constitution of 1908. But the inference is inescapable that the company, having exhausted its capital of $100,000 in 1904, at which time it obtained a municipal franchise, doubled its capital structure and obtained authority to issue mortgage bonds, engaged in a plan of improvements, extensions and additions to its capital structure and physical plant, and that obviously this would be continuous for longer than merely the ensuing period of time before Act No. 264, Pub. Acts 1905, came into effect (June 16, 1905). We conclude that the facts and circumstances of this case bring the situation within the *Constantine Case, supra,* and that the Michigan Public Service Company has a right to use the streets and alleys of the city for its poles and wires during the continuation of its corporate life, including any extensions thereof.

Although the corporate plaintiff has the right to use the city streets and alleys for its poles and wires, by virtue of Act No. 264, Pub. Acts 1905, appellants concede that this is not an exclusive right. This brings us to the other question raised in the chancery case, whether the defendants should be enjoined from taking any steps toward acquiring, operating or maintaining a municipal electric generating plant and distribution system, and from issuing any mortgage bonds for such purposes based on an election. This will be considered in connection with the quo warranto proceeding.

*Validity of the Municipal Election.* Early in 1939, the Cheboygan city council considered (but did not adopt) a resolution to amend the city charter, to

provide for a municipal electric light and power plant and to issue mortgage bonds to defray the expense. The city employed an engineering firm to make a survey of the situation. Numerous reports and recommendations from the engineers were filed with the city council, and the council considered various plans, whether to purchase electrical energy, construct a municipal plant, or purchase the existing plant of the corporate plaintiff. During the ensuing 3 or 4 years various petitions were signed by citizens and considered by the city council recommending the construction of a municipal plant or the purchase of such facilities. The proposition became the object of various items in the local newspapers. In March, 1946, the city published a notice that at the annual spring election to be held April 1, 1946, an election would be held to vote on (1) a proposal for the city to acquire by purchase or construction an electric generating plant and/or distribution system for supplying the city and its inhabitants with electric light and power; and (2) to grant a franchise, to be included as part of the security for mortgage bonds issued to pay the costs. The electors voted overwhelmingly in favor of such municipal electric system. However, at that time the city charter of Cheboygan did not contain any provision for acquiring a municipal electric plant and distribution system, or for issuing mortgage bonds beyond the general limit of its bonded indebtedness prescribed by law. And at about the same time, this Court, in *Sault Ste. Marie City Commission* v. *Sault Ste. Marie City Attorney*, 313 Mich. 644, held that in the absence of charter authority a municipality did not have such powers. The Court (syllabi) held:

"The provision of the Constitution authorizing cities or villages to acquire or operate public utilities and issue mortgage bonds therefor beyond the

general limit of bonded indebtedness prescribed by law but subject to certain restrictions upon such mortgage bonds must be considered in connection with other provisions of the Constitution relating to cities and villages and with the home-rule act for cities enacted pursuant thereto in suit wherein it is asserted such constitutional provision is self-executing (Const. 1908, art. 8, §§ 20, 21, 24; 1 Comp. Laws 1929, § 2228 *et seq.*).   *   *   *

"The constitutional authorization of municipal utilities does not, alone, give a home-rule city the power to purchase a public utility and issue proposed revenue bonds, observance of general statutes implementing such power being also required (Const. 1908, art. 8, §§ 23–25).   *   *   *

"Notwithstanding provision of home-rule city charter that it should 'have and may exercise all powers which now or hereafter it would be competent for this charter specifically to enumerate,' where city seeks to acquire electric-light plant and system and issue revenue bonds therefor and home-rule city act authorizes specific charter provision therefor, the charter should be amended so to incorporate such powers in the charter expressly (1 Comp. Laws 1929, §§ 2233, 2236; Sault Ste. Marie Charter, § 3).

"Under the home-rule city act a city may submit an amendment to its charter to the electors to authorize purchase of an electric-light plant and system and at the same election submit to the electorate a proposition to make a particular contract within the scope of the proposed amendment (1 Comp. Laws 1929, §§ 2233, 2236)."

While Cheboygan is not a home-rule city, the municipal authorities considered that there was doubt as to the legality of the election. The city's public lighting committee later gave the public the following explanation for the city's subsequent position:

"In the April, 1946, election the citizens of Cheboygan voted in favor of a municipal lighting plant.

At about the time of the April election the Michigan Supreme Court handed down a decision in a case involving the city of Sault Ste. Marie, Michigan, which your committee felt would affect the proposed municipal lighting plan. To avoid the possibility of litigation, your committee felt that it would be better to again submit the proposal to the people of Cheboygan, together with the proposed charter amendment, to comply with the new interpretation of the law as handed down by the Michigan Supreme Court."

However, we are not called upon to decide whether the election held April 1, 1946, was a nullity. See chapter 27, § 1, of the fourth-class-cities act (Act No. 215, Pub. Acts 1895) (1 Comp. Laws 1929, § 2100 * [Stat. Ann. § 5.1895]); *Andrews* v. *City of South Haven,* 187 Mich. 294 (L. R. A. 1916A, 908, Ann. Cas. 1918B, 100); *Michigan Gas & Electric Co.* v. *City of Dowagiac,* 273 Mich. 153.

The matter was held in abeyance by the city and no further action taken until August 20, 1946, when the city council adopted a resolution for an election to amend the city charter by adding a chapter, inclusive of the following propositions:

"Section 1. The city of Cheboygan is hereby authorized and shall have the power to construct, purchase, purchase by condemnation of private property for public use, own, operate, and maintain an electric generating plant and/or distributing system for the purpose of supplying light, heat and power, to the municipality and the inhabitants thereof, and others permitted by law, for domestic, commercial, and municipal purposes, within and without the corporate limits of the city of Cheboygan.

"Sec. 2. The city of Cheboygan is hereby authorized to issue mortgage bonds beyond the general limit of bonded indebtedness prescribed by law, for the construction, or purchase, or purchase by con-

---

* 1 Comp. Laws 1948, § 107.1.—Reporter.

demnation of private property for public use, of any electric generating plant and/or distributing system, provided that the mortgage bonds so issued shall not impose any liability upon the city of Cheboygan, but shall be secured only upon the property and revenue of the electric generating plant and/or distributing system, including a franchise to operate such electric light plant and distributing system, within the city of Cheboygan for a period of 20 years from the date of sale of such electric generating plant and/or distributing system and franchise on foreclosure. Such franchise is hereby granted and specifically declared to be a part of the property of the utility to be covered by the mortgage, and such franchise shall be on the following terms."

The terms of the franchise were then set up in the resolution. The resolution provided for submitting the amendments to the electors at the next general election to be held November 5, 1946, and the proposals for the same were set up on the ballots as follows:

### "Proposal No. 1

"Shall the amendment of the city charter authorizing the city of Cheboygan to own operate and acquire by purchase or condemnation of private property for public use, of any generating plant and/or distributing system be adopted by the city of Cheboygan?

"In favor.  Yes (   )
"Opposed.  No  (   )

### "Proposal No. 2

"Shall the amendment of the city charter be adopted by the city of Cheboygan authorizing the city of Cheboygan to issue mortgage bonds beyond the general limit of bonded indebtedness prescribed by law, provided the mortgage bonds so issued shall not impose any liability on the city of Cheboygan but shall be secured only upon the property and revenue of the electric generating plant and/or distributing

system, including a franchise to operate such system within the city of Cheboygan for a period of 20 years from the date of the sale of such generating plant and/or distributing system and franchise on foreclosure, and authorizing the city of Cheboygan to create a sinking fund into which shall be paid monthly from the earnings of the said electric generating and/or distributing system a sufficient sum to retire all bonds at maturity and to pay out interest due on bonds not retired. The said franchise shall be on the following terms: (Articles 1 to 11, inc., of the franchise repeated.)

"In favor. Yes (  )
"Opposed. No  (  )"

The city authorities apparently considered it advisable to resubmit to the voters the proposal to acquire a municipal electric plant and system and to issue mortgage bonds therefor, inasmuch as at the time the election was held, April 1, 1946, at which these proposals were adopted, charter authority therefor was lacking. The *Sault Ste. Marie Case* having held that the proposal to acquire a municipal electric system might be submitted at the same election with a proposal to amend the charter, the city council on September 19, 1946, adopted another resolution, to resubmit to the electors the said proposals. These proposals were as follows:

"PROPOSAL No. 1

"Proposal to acquire an electric generating plant and/or distributing system for supplying light, heat and power to the city of Cheboygan.

"Shall the city of Cheboygan acquire by purchase or construction, or both, an electric generating plant and/or distributing system for supplying the city of Cheboygan, its inhabitants and others permitted by law with electric light, heat and power?

"In favor. Yes (  )
"Opposed. No  (  )

"Proposal No. 2

"Proposal to grant the franchise to be included in the mortgage to be given as security for bonds to be issued to acquire an electric generating plant and/or distributing system.

"Shall there be included in the mortgage to be given as security for bonds to be issued to pay the costs of acquiring an electric generating plant and/or distributing system a franchise to be granted by the city of Cheboygan to the purchaser on foreclosure of said mortgage to operate said electric generating and/or distributing system for a period of 20 years from the date of said foreclosure? (Then followed the terms of the franchise.)

"In favor        Yes  (    )
"Opposed       No   (    )"

Both resolutions, to amend the city charter and for authority to acquire a municipal electric plant, and also notices of the election for those purposes, were officially published in 2 newspapers printed and circulated in the city, and notices of the election were also posted in each ward. The vote at the election held on November 5, 1946, was overwhelmingly in favor of all the proposals, *i.e.*—for the charter amendments, for a municipal electric system, for issuance of mortgage bonds, and for authorization of a franchise as part of the security for mortgage bonds. Within the allowed time thereafter, the plaintiffs filed the instant bill in chancery and the information in the nature of quo warranto, now before us.

Appellants' brief, in their statement of questions involved, advances 32 reasons as to why the entire proposition should be considered a nullity; but, in discussing the questions involved, fails to comply with Court Rule No. 67, § 1 (1945), which requires:

"The stated questions herein required shall be used in the same order as topical subheadings

throughout the 'argument' in appellant's brief provided for in section 3 of this rule."

Appellants, in discussing the election, limit their brief to 5 topical subheadings, which will be considered in the order they are submitted.

1. *"Was the resolution of the city council of August 20, 1946, proposing amendments to the charter of the city and purporting to call a special election thereon illegal, void and invalid?"*

The resolution was within the power of the council to enact. Act No. 279, § 21, Pub. Acts 1909 (1 Comp. Laws 1929, § 2257), as amended by Act No. 279, Pub Acts 1939* (Comp. Laws Supp. 1940, § 2257, Stat. Ann. 1946 Cum. Supp. § 5.2100) provides:

"Any existing city charter, whether passed pursuant to the provisions of this act or heretofore granted or passed by the legislature for the government of a city, may from time to time be amended in the manner following:   *   *   *   Any proposed amendment shall be confined to one subject and in case a subject should embrace more than one related proposition, each proposition shall be separately stated to afford an opportunity for an elector to vote for or against each such proposition."

The two proposed amendments submitted to the electors under said resolution were, in effect:

1. The establishment of charter power to acquire and operate a municipal electric utility; and

2. The establishment of charter power to finance its acquisition.

The 2 related propositions were separately submitted and an opportunity given the electors to vote separately on each one. The resolution accords with the above provision of the statute. It proposes

---

* Amendment by Act No. 87, Pub. Acts 1947 (see 1 Comp. Laws 1948, § 117.21), does not apply.

to add a chapter to the city charter relative to a municipal electric system. Related to such proposition, the resolution by section 2 refers *separately* to the issuance of mortgage bonds solely for the purposes stated and in accordance with section 1. Appellants argue that two different propositions were included in section 1 because it included both acquisition by purchase and by condemnation. In *City of Allegan* v. *Iosco Land Co.,* 254 Mich. 560, 566, the Court held to the contrary:

"Both purchase and condemnation are so commonly employed in acquiring property for public improvements that it would be difficult to imagine that the legislature intended to require the electors to approve a precise method of acquisition rather than to grant the council power to acquire, leaving to it the method which may be advisable or necessary under the circumstances."

Appellants contend that section 2 of the resolution likewise provides for 2 separate and unrelated propositions, *i.e.,* authority to issue revenue bonds and the granting of a franchise to operate such electric plant and distribution system as security for the payment of the mortgage bonds in case of default. The plain answer to this objection is found in constitutional as well as statutory authority, in both of which the power is given to the municipality to issue mortgage bonds beyond the general limit of bonded indebtedness and to grant a 20-year franchise to operate the utility as a part of the security underlying the mortgage. The Constitution (1908), art. 8, § 24, provides:

"When a city or village is authorized to acquire or operate any public utility, it may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law: *Provided,* That such mortgage bonds issued beyond the general lim-

it of bonded indebtedness prescribed by law shall not impose any liability upon such city or village, but shall be secured only upon the property and revenues of such public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than 20 years from the date of the sale of such utility and franchise on foreclosure."

A similar provision is found in 1 Comp. Laws 1929, § 2233* (Stat. Ann. 1949 Rev. § 5.2076).

Hence, it was proper to submit the terms of the franchise in the proposition to authorize the issuance of mortgage bonds. If they were to be submitted separately, the authority to issue bonds might be approved while the constitutional requirement for a franchise to set up terms in event of a default might be rejected. Such a possibility doubtless was the occasion for allowing the inclusion of the franchise terms with the proposition to authorize the issuance of the mortgage bonds. Appellants concede that:

"The city needed no authority to grant a franchise. Its charter provisions were ample for that and it had been so doing for 50 years. It needed no charter amendment to call an election for the approval or rejection of such a franchise."

In *Stanhope* v. *Village of Hart*, 233 Mich. 206, the Court said:

"Any mortgage given must carry an irrevocable franchise, operative for not more than 20 years after foreclosure. Such franchise gives vitality, in case of foreclosure, to otherwise dead property and, of course, offers the principal inducement for the loan. May such a franchise come into existence and be operative without any action by the electors beyond their authorization of a hydro-electric plant and of

---

* 1 Comp. Laws 1948, § 117.4c.—REPORTER.

less than one-half the cost of the physical property?
There must be a franchise with the mortgage; the
Constitution so provides. Such franchise must be
granted by authority of law. The franchise must not
be revocable at the will of the village during the
period fixed for its duration after it is operative
under mortgage foreclosure. * * * The franchise
in the mortgage must be granted *in praesenti* to be-
come operative *in futuro;* and it must be irrevocable
by the village, for the period fixed therein, after it
becomes operative through foreclosure. The fran-
chise must be granted before the mortgage is given
for it is a part of the security required by the Con-
stitution to be incorporated in the mortgage."

Plaintiffs further contend that section 2 of the res-
olution of August 20, 1946, is invalid in that it pro-
vides for the calling of bonds before maturity, where-
as the statute (1 Comp. Laws 1929, § 2233 [Stat.
Ann. § 5.2076]) grants no authority for so calling
of bonds. However, the statute does not prohibit
such a practice but, on the contrary, by implication
leaves such matters of detail to the issuing author-
ity. It provides in part:

"Each city which is authorized to acquire, own,
purchase, construct or operate any public utility,
may provide in its charter for the issuance of mort-
gage bonds therefor beyond the general limit of the
bonded indebtedness prescribed by law."

In that connection, see *City of Allegan* v. *Iosco
Land Co., supra.* There is nothing in said section
prohibiting the call features of the mortgage bonds
here in question.

Section 4 of the resolution of August 20th pur-
ports to give the charter amendments immediate
effect. Appellants insist that is not in accordance
with the statute (1 Comp. Laws 1929, § 2260, as
amended by Act No. 175, Pub. Acts 1941* [Comp.

---

* 1 Comp. Laws 1948, § 117.24.—REPORTER.

Laws Supp. 1945, § 2260, Stat. Ann. 1949 Rev. § 5.2103]). This statute requires that 2 copies of the amendment should, within 30 days after the vote is taken, be filed with the secretary of State and the county clerk "and shall thereupon become law." The 1941 amendment (Act No. 175, Pub. Acts 1941) adds:

"Unless a different date for the taking effect of such charter or charter amendment, or any part thereof, is specifically set forth therein."

However, we need not here decide whether the 1941 amendment permits the taking effect before, as well as after, the filing of the copies. In the instant case the claimed error was harmless, is moot (see *McCarthy* v. *Wayne Circuit Judge,* 294 Mich. 368), and affords no ground for invalidating the election. See *Simpson* v. *Paddock,* 195 Mich. 581.

The resolution of August 20, 1946, was officially published in 2 newspapers of the city. The electors had knowledge of the full wording of the resolution. In *People, ex rel. Speed,* v. *Hartwell* (syllabus), 12 Mich. 508 (86 Am. Dec. 70), this Court held:

"Electors of a city are presumed to have notice of the proceedings of the common council, which are published in the official paper of the corporation."

We have examined in detail other objections raised by appellants as to the validity of the resolution and find them equally without merit. The form in which the proposed amendments were to be submitted on the ballots was comprehensive and not misleading. It was not necessary to detail in the resolution what, if any, other provisions of the charter might be inconsistent therewith and therefore repealed. The council, in giving notice of the election, gave notice of the time, place and hours, the proposals were submitted at the general November

election held November 5, 1946, and the resolution and notice of election were sufficient.

2. *"Was the resolution of the city council of September 19, 1946, purporting to authorize the city to acquire a public utility; to issue mortgage bonds to approve a franchise; and calling a special election, void, illegal and invalid?"*

Appellants claim that the council had no power to adopt this resolution, in view of the invalidity of the previous resolution which was adopted August 20th for an election to amend the charter. As we have already concluded, the previous action was not invalid, hence, there can be no merit in said claim. Appellants further claim that the resolution, and *a fortiori* the election, is a nullity because it proposes an alternative and duplicitous authority, mostly based on the use of the words "and/or." This question will be specifically considered under appellants' fifth topical subhead.

3. *"Were the notices of election for the special election called on November 5, 1946, invalid, illegal and void so as to render the election a nullity?"*

4. *"Were the ballots used upon the election of November 5, 1946, illegal, invalid and void; were in the alternative; were duplex; mislead and confused the voters and rendered the election a nullity?"*

These involve similar issues and may well be considered together. Appellants do not question the fact of publication. The contention is that the notice of the special election provided for opening the polls from 7 a.m. to 8 p.m. as provided by State law for general elections, instead of from 8 a.m. until 5 p.m. as provided by the city charter for city elections. A further objection is made that the polling places were designated by the city clerk and not by the city council as provided in the city charter for city elections. A third objection is that the wording

of the proposals in the notice was not in the same language as used.in the resolutions. (This is mainly based on the use of the words "and/or.") The fourth contention is that the notice of election did not contain the full text of the resolutions. No authority is cited in support of appellants' claim that the election should be held a nullity for the above reasons. Plaintiffs did not, in their pleadings or at the trial, nor do they here, show that any elector was misled or hindered in his voting at the election on November 5, 1946, by reason of the fact that the *council* did not designate voting hours or polling places, or by reason of any other irregularity in the proceedings of the council or in the holding of the election. The sum of appellants' argument is that the election itself should be set aside for irregularities in the method of designating polling hours and places, and other irregularities going to the form of submission, advertising, posting of notices, et cetera. There were 2 separate ballots used in the election. One submitted the 2 proposals, as to amending the city charter. The other contained the 2 proposals, whether to authorize a municipal electric system and to issue mortgage bonds therefor. The ballots afforded the electors an opportunity to vote separately on each of the 4 "related" proposals. There can be no doubt but that the electors had ample notice and opportunity to become fully informed as to these proposals. The same conclusion applies equally to all of the claimed irregularities in submitting them to the voters.

"Further objections affecting the validity of the charter amendments are that they were not lawfully submitted to the electors. These objections go to the form of submission, advertisement, posting of notices, and conduct of the election. We have carefully considered all of them and are not convinced that they have sufficient merit to require discussion.

There were irregularities, but the important fact is that there is no claim or showing that any elector was misled or hindered in his voting by reason of such irregularities. The record shows that for months immediately preceding the election the amendments were given the widest publicity and every opportunity afforded the voter to intelligently and freely express himself at the polls. We find no irregularity fatal to the validity of the amendments." *City Commission of Jackson* v. *Hirschman,* 253 Mich. 596.

"Lastly, invalidity is urged in that the notices of election were not published and posted as required by law. There was publishing and there was posting, but not for full time as required. It is to be noted that the question was submitted at the general spring election. The electors had full notice of that election. *State* v. *Carroll,* 17 R. I. 591 (24 Atl. 835). The notice here would serve the purpose of informing electors of the question to be then and there voted upon. The record is wholly to the effect that the matter was given widest publicity by public discussion throughout the county and by the press and otherwise, and is likewise to the effect that the irregularities were without prejudice, and they will, therefore, be held not fatal to validity of bonds." *County of Bay* v. *Hand,* 257 Mich. 262, 268.

"We find no defects in the petitions or in the manner of submitting the proposed amendment, to such extent that the amendment must now be declared a nullity. In that regard we are not unmindful of the fact that to now declare the amendment a nullity would thwart the expressed will of the voters. We also are conscious of the fact that these objections might have been raised in advance of the submission, as was done in *Leininger* v. *Secretary of State, ante,* 644 (316 Mich. 644), decided March 3d." *City of Jackson* v. *Commissioner of Revenue,* 316 Mich. 694, 711.

"Furthermore, after a question has been submitted to and approved by the electors, substantial compliance with the preliminary steps has often been held to be sufficient. *Thomas* v. *Kent Circuit Judge,* 116 Mich. 106; *City Commission of Jackson* v. *Hirschman,* 253 Mich. 596; *County of Bay* v. *Hand,* 257 Mich. 262; *City of Jackson* v. *Commissioner of Revenue,* 316 Mich. 694." *Attorney General, ex rel. Trahair,* v. *Landel Metropolitan District,* 318 Mich. 376, 381.

In *Attorney General, ex rel. Miller,* v. *Miller,* 266 Mich. 127, 133 (106 A. L. R. 387), the Court quoted with apparent approval as follows:

" 'Statutes giving directions as to the mode and manner of conducting elections will be construed by the courts as directory, unless a noncompliance with their terms is expressly declared to be fatal, or will change or render doubtful the result.   *   *   *   Before election it is mandatory if direct proceedings for its enforcement are brought, but after election it should be held directory, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or the ascertainment of the result, or unless the provisions affect an essential element of the election, or it is expressly declared by the statute that the particular act is essential to the validity of the election, or that its omission will render it void.' 20 C. J. pp. 181, 182, § 223."

We find that none of the irregularities complained of requires the setting aside of the election.

5. *"Did the use of the phrase 'and/or' in the proposed amendments to the charter in the proposed franchise in the resolutions of the city council, the calling of the election and their use in the ballots present such duplex, alternative, confusing and misleading questions as to render all of the said proceedings void?"*

The precise language in the resolution, franchise, amendments and ballots at which this objection is pointed is "the electric generating plant and/or distributing system." Because of the use of that phrase appellants claim the election is void and should be set aside.

At the outset we should make it plain that the use of the phrase "and/or" is the subject of frequent abuse and should be avoided. Courts, generally, have condemned the use. In *Preble* v. *Architectural Iron Workers' Union of Chicago, Local No. 63, I.A.B.S. and O.I.W.*, 260 Ill. App. 435, 442, the court said:

"We must condemn the use of the words 'and/or' because they tend to confuse and mislead.  *  *  * The use of these words tends to uncertainty and confusion."

In *Ollilo* v. *Clatskanie Peoples' Utility District*, 170 Ore. 173, 179 (132 Pac. [2d] 416), the court said:

"The use of the words 'and/or'—a sort of verbal monstrosity which courts have quite generally condemned."

For more intemperate language in condemning the use of the term, see *Employers Mutual Liability Ins. Co.* v. *Tollefsen*, 219 Wis. 434, 437 (263 N. W. 376).

"And" is a conjunctive, used to denote a joinder, a union. "Or" is the opposite, a disjunctive, used to indicate a disunion, a separation, an alternative. There are occasions where intent may properly be expressed by "and/or," indicating "both, or either." There are circumstances under which "it made no difference whether the conjunctive 'and' or disjunctive conjunction 'or' was used." *People* v. *Harrison* (syllabus), 194 Mich. 363. Under the circumstances of its use here, we believe it had no effect on the

election, and that the election should not be declared a nullity because of its use. Obviously the election was called to let the voters decide whether the city should acquire, maintain and operate a municipal electric system. The details were left to the municipal authorities to whom the power was given. See *City of Allegan* v. *Iosco Land Co., supra*. The question was not raised before the election and there is no showing of any misunderstanding by the electors as to the proposals which were being submitted for their consideration.

The use of the phrase "and/or" in an election under a local option statute was condemned in *Costas* v. *Board of Supervisors of Lauderdale County*, 196 Miss. 104 (15 South. [2d] 365, 16 South. [2d] 378, 154 A. L. R. 863), but held not to invalidate the election because the court could not see how doubt could remain in the electors' minds as to what they were voting on. The question has not been squarely passed upon by this Court. However, in *Consumers Power Co.* v. *City of Allegan*, 248 Mich. 34, 40, the issue was raised as to whether the following words on a ballot were in the alternative and disjunctive form:

"Shall the city of Allegan acquire, *by purchase or construction,* works for supplying the city and its inhabitants with electric light and power."

The Court held:

"The question that the electors of Allegan wanted to decide and did decide was whether the municipality should own and operate an electric light and power plant. The manner in which it was to be 'acquired,' whether by purchase or by construction, was only an incident. So construed, the ballot presented a single issue."

We conclude that the use of the phrase "and/or," inept as it must be said to have been, is not sufficient ground to nullify the will of the voters.

Each of these proposals submitted to the electors November 5, 1946, was affirmatively approved by more than three-fifths (by approximately 70 per cent.) of the electors voting thereon. We do not find merit in any of the questions here presented by the appellants sufficient to require that the election be declared a nullity.

The judgment entered in the court below dismissing the information in the nature of quo warranto is affirmed. A decree may be entered in this Court in the chancery case in accordance with this opinion. No costs awarded, a public question being involved.

Sharpe, C. J., and Bushnell, Reid, North, Dethmers, Butzel, and Carr, JJ., concurred.