*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GOURMET DELI REN CEN, INC.,

        Plaintiff-Appellant,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

        Defendant-Appellee.

UNPUBLISHED
May 26, 2022

No. 357386
Wayne Circuit Court
LC No. 2020-008882-CB

Before: BORRELLO, P.J., and SHAPIRO and HOOD, JJ.

PER CURIAM.

Plaintiff Gourmet Deli Ren Cen, Inc. (Gourmet) appeals as of right the order denying its motion for summary disposition and granting summary disposition in favor of defendant Farm Bureau General Insurance Company of Michigan (Farm Bureau). On appeal, Gourmet argues the trial court erred in determining Gourmet was not entitled to business income or civil authority coverage under its insurance policy from the business it lost as a result of COVID-19, or the Governor's executive orders regarding COVID-19. We affirm.

## I. BACKGROUND

This case arises from Gourmet's closure in March 2020. Gourmet was a delicatessen and restaurant located in the General Motors Renaissance Center (GMRC), an office complex consisting of seven connected skyscrapers in Downtown Detroit. Gourmet's customer base consisted primarily of others working in the GMRC. Gourmet's insurance policy with Farm Bureau contained, among other things, business income and civil authority coverage. Relevant portions of the policy are provided below:

### SECTION I
### PROPERTY COVERAGES INCLUDING EQUIPMENT BREAKDOWN

### LOSS OF BUSINESS INCOME

-1-

Subject to all the provisions applicable to Section I of this policy, except the Coinsurance Clause and Deductible Clause, this policy is extended to insure against the actual loss of business income sustained and extra expense incurred by you caused by the perils insured against damaging or destroying, during the policy period, building(s) or business personal property (except finished stock manufactured by you) at the premises described in the Declarations.

We will be liable for loss of business income sustained and extra expense incurred for only such length of time as would be required to resume normal business operations, but not exceeding such length of time as would be required to rebuild, repair, or replace, as promptly as possible, such part of the described property as has been damaged or destroyed as a direct result of an insured peril.

\* \* \*

**Loss of Business Income–Extensions of Coverage**

\* \* \*

**Civil Authority.** We will pay for the actual loss of business income you sustain and necessary extra expense caused by action of civil authority that prohibits access to the premises described in the Declarations due to direct physical loss of or damage to property, other than at the premises described in the Declarations, caused by or resulting from a peril not otherwise excluded under this policy.

\* \* \*

**Loss of Business Income–Limitations and Exclusions**

We will not be liable for:

1. any increase in loss which may be occasioned by:

(a) enforcement of any ordinance or law regulating the use, construction, repair, or demolition of property;

\* \* \*

2. loss due to delay or loss of market;

3. any other remote or consequential loss[.]

The policy has an additional set of exclusions:

**SECTION I**
**PERILS AND EXCLUSIONS**
**SPECIAL COVERAGE INCLUDING EQUIPMENT BREAKDOWN**

* * *

**EXCLUSIONS**

This policy does not insure under Section I for loss caused directly or indirectly by Exclusions 1., 2., 9., and 20., listed below, or Conditions 4., 5., or 6.[,] [i]n the Conditions Applicable to Section I part of Policy Conditions and Definitions. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

We will not be liable for loss:

* * *

15. caused by acts or decisions, including the failure to act or decide, of any person, group, organization, or governmental body. However, if a peril not otherwise excluded ensues, we will pay for the loss caused by the ensuing peril[.]

In response to the COVID-19 Pandemic, Governor Gretchen Whitmer issued Executive Order No. 2020-9, effective March 16, 2020. The order prohibited various places of public accommodation, including restaurants, from "ingress, egress, use, and occupancy by members of the public[.]" However, it also noted: "Places of public accommodation subject to this section are encouraged to offer food and beverage using delivery service," or similar means.

Under Executive Order 2020-9, GMRC remained open to its tenants, but closed to the public unless there was business with a specific tenant, in which case members of the public could enter. Executive Order 2020-9, subsequent executive orders, and Wayne County Health Department orders, did not prevent Gourmet from remaining open or offering carryout or delivery services. GMRC and its leasing office did not require its closure.

After ceasing operations in March 2020, Gourmet submitted a claim for loss of business income and inventory with Farm Bureau. Farm Bureau denied Gourmet's claim because there was no direct physical damage to the property.

In March 2020, after Gourmet ceased operations, GMRC's leasing agent informed Gourmet and other tenants that an employee of a building vendor tested positive for COVID-19. The contact tracing did not show a COVID-19 exposure at Gourmet's location. None of Gourmet's employees or managers tested positive for COVID-19 prior to Gourmet's decision to cease operations. There was never a specific order that required Gourmet to stop operating. In June 2020, Gourmet tried to reopen, but quickly determined reopening was not financially feasible and decided to close to mitigate its damages.

Gourmet filed suit, in Wayne Circuit Court, seeking a declaratory judgment that Gourmet's claims were covered by its policy, and alleging breach of contract against Farm Bureau. Gourmet moved for partial summary disposition, under MCR 2.116(C)(10), and declaratory judgment under MCR 2.605. Gourmet argued that the executive orders defeated the purpose of its lease space, which was to serve the tenants of the GMRC, primarily General Motors employees, most of whom were required to work remotely. Gourmet alleged that the presence of COVID-19 near Gourmet's

restaurant and on surfaces at GMRC constituted "physical loss" or "damage to property" within the meaning of its policy. Gourmet also argued it had an independent basis for coverage, under its civil authority coverage, which also did not require structural alteration of property.

Farm Bureau responded to Gourmet's motion for declaratory judgment and partial summary disposition, and filed a counter-motion for summary disposition, under MCR 2.116(I)(2). Farm Bureau argued that Gourmet acknowledged it was permitted to remain open for carryout and delivery under the executive orders, and stated subsequent executive orders permitted Gourmet to expand its operations further, but Gourmet still chose to close. It argued there was no physical loss. Farm Bureau concluded there was no coverage because there was no physical problem with the space or nearby buildings as required under the policy.

The trial court held a hearing on the motions and noted, with COVID-19 exposure, only the area of contact with the individual is disinfected and evacuated for a few days, and indicated it had difficulty attributing this impact to damaging an entire building. The trial court denied Gourmet's motion, and granted Farm Bureau's motion for summary disposition under MCR 2.116(C)(10) and (I)(2). Gourmet filed a timely claim of appeal.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Candler v Farm Bureau Mut Ins Co of Mich*, 321 Mich App 772, 777; 910 NW2d 666 (2017) (citation omitted). A trial court, in evaluating a motion for summary disposition under MCR 2.116(C)(10), "considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* (quotation marks and citation omitted).

> Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*West v Gen Motors Co*, 469 Mich 177, 183; 665 NW2d 468 (2003).]

"The trial court appropriately grants summary disposition to the opposing party under MCR 2.116(I)(2) when it appears to the court that the opposing party, rather than the moving party, is entitled to judgment as a matter of law." *BC Tile & Marble Co, Inc v Multi Bldg Co, Inc*, 288 Mich App 576, 590; 794 NW2d 76 (2010) (quotation marks, footnote, and citation omitted). Finally, "the interpretation and application of an insurance policy . . . is a question of law reviewed de novo." *Hunt v Drielick*, 496 Mich 366, 372; 852 NW2d 562 (2014).

## III. LAW AND ANALYSIS

Gourmet argues the trial court erred in granting summary disposition to Farm Bureau because its losses resulting from COVID-19 and Executive Order 2020-9 were entitled to business income and civil authority coverage under its policy with Farm Bureau. We disagree.

A. LEGAL STANDARD FOR INTERPRETING INSURANCE POLICIES

"An insurance policy is similar to any other contractual agreement, and, thus, the court's role is to determine what the agreement was and effectuate the intent of the parties." *Drielick*, 496 Mich at 372 (quotation marks and citation omitted). Michigan courts use a two-part analysis to determine the intent of the parties by (1) determining whether there is coverage under the policy and (2) whether any exclusions apply. *Id.* at 373. Although it is the insured's burden to establish that his claim falls within the terms of the policy, it is the insurer's burden of proving an absence of coverage. *Id.* "Additionally, '[e]xclusionary clauses in insurance policies are strictly construed in favor of the insured.' " *Id.* (citations omitted). "However, '[i]t is impossible to hold an insurance company liable for a risk it did not assume,' . . . and, thus, '[c]lear and specific exclusions must be enforced[.]' " *Id.* (citations omitted).

"The same contract construction principles apply to insurance policies as to any other type of contract because it is an agreement between the parties." *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 291; 778 NW2d 275 (2009). The court must read the insurance policy as a whole to determine the parties' intent and give it effect. *Id.* at 292. We enforce an insurance policy according to its terms, and "[w]here a term is not defined in the policy, it is accorded its commonly understood meaning." *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 534; 676 NW2d 616 (2004). The court may consult a dictionary "to ascertain the plain and ordinary meaning of words or phrases used in the contract." *Auto Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015). "A court must look at the contract as a whole and give meaning to all terms." *Id.* (quotation marks and citation omitted). "After ascertaining the meaning of a contract's terms, a court must construe and apply unambiguous contract provisions as written." *Id.* (quotation marks and citation omitted). Finally, "[a]n insurance contract must be construed so as to give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory." *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 715; 706 NW2d 426 (2005).

B. BUSINESS INCOME COVERAGE

Gourmet asserts it is entitled to business income coverage because the existence of COVID-19 in the GMRC is a direct physical loss to property, since it attaches to surfaces and the air. Gourmet argues this initial presence, combined with the risk of future COVID-19 exposure in the GMRC, and, by proximity, Gourmet's space, constitutes direct physical loss. We are not persuaded for three reasons.

First, Gourmet's attempt to frame its closure because of COVID-19 and Executive Order 2020-9 as "property damage" resulting from an "occurrence" as defined by the policy improperly relies on policy terms that do not relate to business income coverage. The policy's business income coverage does not mention "property damage." Instead, it provides coverage for "loss of business income sustained . . . by the perils insured against damaging or destroying . . . building(s) . . . ." The defined term "property damage" includes loss of use of property caused by an "occurrence," the definition of which includes "continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from your standpoint." Even if COVID-19 and Executive Order 2020-9 amounted to "property damage," as defined in the policy, they do not bear on business income coverage, which has other requirements.

Second, we are not persuaded by Gourmet's argument that insurers' decisions to include clauses excluding coverage for viral outbreaks implies that viral outbreaks cause physical damage. Gourmet provides no support for this claim aside from its argument that determining otherwise would make such clauses surplusage because policies already bar recovery for losses which do not stem from physical damage. However, if this interpretation had merit, it would render various other common exclusions surplusage as well. For example, the policy in this case contains a war liability exclusion, precluding coverage for bodily injury or property damage resulting from war or insurrection, neither of which can be argued to be intangible, incorporeal forces. Gourmet's reasoning would require this exclusion, among countless others, to be struck from insurance policies as surplusage, when they do no more than provide extra protection to insurers regarding specific, identified situations, which may lead an insured to seek coverage. Furthermore, by Gourmet's logic, even if other insurers had, by including such exclusionary provisions, agreed that viral outbreaks cause physical damage, the absence of the exclusion in the policy in this case would mean defendant impliedly rejected this contention, and defendant cannot be held liable for "a risk it did not assume." *Drielick*, 496 Mich at 372 (quotation marks and citation omitted).

Next, we note Gourmet and Farm Bureau have focused a large portion of their arguments regarding Gourmet's business income coverage on the definition of "direct physical loss of or damage to" property, and whether this definition requires a structural alteration. However, this is not the relevant language under the policy for business income coverage. Instead, the relevant inquiry is whether "loss of business income [was] sustained . . . by the perils insured against damaging or destroying . . . building(s) . . . ." "Damage" is defined as the "loss or harm resulting from injury to person, property, or reputation." *Merriam-Webster's Collegiate Dictionary* (11th ed). Further, while the Merriam-Webster definition of "injury" merely relates back to the definition of "damage," Black's Law Dictionary provides further insight, defining damage more narrowly as: "Loss or injury to person or property; esp., physical harm that is done to something or to part of someone's body[.]" *Black's Law Dictionary* (11th ed). "Destroy" is defined as "to ruin the structure, organic existence, or condition of" or "to put out of existence." *Merriam-Webster's Collegiate Dictionary* (11th ed).

Reading the policy as a whole, *Hastings*, 286 Mich App at 293, also calls for the narrower definition of the word "damage" requiring physical harm or alteration. The policy provides coverage for losses:

> [F]or only such length of time as would be required to resume normal business operations, but not exceeding such length of time as would be required to rebuild, repair, or replace, as promptly as possible, such part of the described property as has been damaged or destroyed as a direct result of an insured peril.

This clause, in limiting coverage to the time required to "rebuild, repair, or replace" the property, indicates the need for physical, structural damage. Gourmet's loss of use of its property for its intended purpose did not render the property in need of rebuilding, repair, or replacement.

This Court, considering near identical language, in *Gavrilides Mgt Co, LLC v Mich Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 354418); slip op at 8, reasoned:

The Executive Orders applied statewide and without regard to actual contamination of premises. Consequently, moving to a new location would not have permitted plaintiffs' restaurants to reopen. Likewise, no repair, reconstruction, or replacement of the premises would have permitted plaintiffs' restaurants to reopen. The clear and unambiguous import of the definition of "period of restoration" is that the contract expects the loss or damage to be amenable to some kind of physical remediation—either by making tangible alterations or repairs to the premises, or by replacing the premises altogether. No alteration to, or replacement of, plaintiffs' premises would have permitted the restaurants to reopen. [*Id.*]

Gourmet's assertion, that the policy provides broad coverage, including coverage for "loss of use" that did not stem from any physical damage or alteration to the property, would render the remediation clause meaningless and illogical, in violation of the rule requiring insurance policies be "construed so as to give effect to every word, clause, and phrase . . . ." *Royal Prop Group, LLC*, 267 Mich App at 715. As this Court recognized in *Gavrilides*, ___ Mich App at ___; slip op at 8, Gourmet cannot repair, rebuild, or replace a property that remains in the same physical condition it was in before, regardless of any alleged damage from loss of use.

During the pendency of this appeal, the United States Court of Appeals for the Sixth Circuit adopted this Court's analysis in *Gavrilides* in *Brown Jug, Inc v Cincinnati Ins Co*, 27 F4th 398, 403-404 (CA 6, 2022). There, the court held that state shutdown orders and capacity restrictions in response to COVID-19 did not trigger Michigan restaurant owners' business interruption coverage because such claims did not arise out of any direct physical loss. *Id.* at 404.

Gourmet's arguments concerning its loss of use and impairment of function need not be addressed because there is no "loss" referenced in this section of the policy. The policy's requirement that the property be damaged or destroyed, by its plain meaning, precludes coverage for only impairment of function or loss of use. Gourmet's need to disinfect the space under CDC guidelines similarly does not constitute damage or loss under the policy, as this Court noted: "We do not think mandating a more rigorous cleaning regimen constitutes damage or loss . . . ." *Gavrilides*, ___ Mich App at ___; slip op at 7.

Gourmet finally asserts there is actual physical loss to the property because the COVID-19 virus particles attach to surfaces, causing harm to humans.[1] However, the policy explicitly requires the damage or destruction be to "building(s) or business personal property . . . at the premises . . . ." There is no mention of damage to people interacting with the premises. Therefore, there is no damage or destruction triggering business income coverage.

---

[1] Even if the Court were to agree that COVID-19 does damage property by harming humans, Gourmet acknowledged that there were no reported COVID-19 incidents traced to its space in its complaint: "No agents and/or employees of Plaintiff have tested positive for Covid-19, and no Covid-19 positive cases have been traced to the insured properties." Gourmet attempted to modify its position when answering Farm Bureau's interrogatories, stating: "One case of COVID-19 was confirmed in the Renaissance Center and the property, including the leased space, has been treated as though COVID-19 is present at all times."

Gourmet's argument rests solely on its speculation that because COVID-19 was found in the GMRC, and the GMRC is a series of interconnected buildings, COVID-19 was likely present in Gourmet's space. However, Gourmet has provided no proof of the actual presence of COVID-19 in its space prior to its complaint. Its argument COVID-19 was likely present in its space because it was found elsewhere indicates, even assuming COVID-19's presence causes physical damage, Gourmet suffered indirect damage, at most, from COVID-19's presence elsewhere in the building, which is not covered by the policy. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption" or "stemming immediately from a source." *Merriam-Webster's Collegiate Dictionary* (11th ed). The alleged damage would not be caused from COVID-19 immediately, and without deviation, because its presence would only be felt by Gourmet as a result of its presence elsewhere in the GMRC complex.

Gourmet failed to submit evidence that: (a) a physical or structural change is not required under the policy, (b) COVID-19 causes property damage from its impact on humans, or (c) COVID-19 was ever present in Gourmet's space. Therefore, Gourmet cannot claim business income coverage. The trial court correctly granted Farm Bureau's motion for summary disposition.

## C.  CIVIL AUTHORITY COVERAGE

Gourmet also asserts it is entitled to civil authority coverage because it was prohibited from using its space for its intended purpose as a result of Executive Order 2020-9 and subsequent orders. Here, Gourmet again focuses on whether the phrase "direct loss of or damage to" requires a structural alteration. Unlike business income coverage, this analysis under the civil authority coverage is proper because the policy actually references losses resulting from "action of civil authority that prohibits access to the premises described in the Declarations due to direct physical loss of or damage to property, other than at the premises described in the Declarations, caused by or resulting from a peril not otherwise excluded under this policy." Regardless, Gourmet's argument that this language does not require some structural alteration is still misplaced.

Gourmet's reliance on *Southlanes Bowl, Inc v Lumbermen's Mut Ins Co*, 46 Mich App 758; 208 NW2d 569 (1973), *Sloan v Phoenix of Hartford Ins Co*, 46 Mich App 46; 207 NW2d 434 (1973), and *Allen Park Theatre Co, Inc v Mich Millers Mut Ins Co*, 48 Mich App 199; 210 NW2d 402 (1973), is misplaced for two reasons. First, cases decided by this Court before November 1, 1990 are not binding precedent. *Redmond v Heller*, 332 Mich App 415, 431 n 7; 957 NW2d 357 (2020); see also MCR 7.215(J)(1). Second, as this Court recognized in *Gavrilides*, while civil authority coverage does not require damage to Gourmet's property, it does require damage to surrounding property:

> Plaintiffs correctly point out that the above provision does not require any damage to, or indeed any physical effect upon, plaintiffs' premises. See *Sloan*[], 46 Mich App [at] 50 . . . . However, the provision unambiguously requires damage to nearby property, and none is alleged. To the extent access to any neighboring properties was prohibited, that prohibition was a result of a health crisis and the specter of person-to-person transmission of a dangerous virus, irrespective of whether those properties were altered. Furthermore, the provision clearly expects a defined area to be cordoned off. The Executive Orders did not do so: any person

-8-

who was excepted from the stay-at-home provision of the Executive Orders could, at least in principle, have driven or walked past plaintiffs' restaurants. Finally, this provision anticipates a response by a civil authority to some discrete damage or threat of damage. We find persuasive the observation in *Newchops Restaurant Comcast LLC v Admiral Indemnity Co*, 507 F Supp 3d 616, 625 (ED Penn, 2020) that "[t]he civil authority action cannot be both the cause of [the] damage and the response to it." Again, the gravamen of the complaint is that plaintiffs' losses occurred due to the closure of their restaurants by the Executive Orders. [*Gavrilides*, ___ Mich App at ___; slip op at 9 (footnote and citation omitted).]

The same principle applies to Gourmet. Although Gourmet's traditional business model was upended when its normal customers, GMRC employees, began working from home, there was nothing stopping new customers from going to Gourmet.

Gourmet's arguments, that the policy does not require a structural alteration, and the loss of use of surrounding property from Executive Order 2020-9 requiring remote work constitutes physical damage, belies the plain terms of the policy. This Court, dispensing with nearly identical arguments considering the identical phrase "direct physical loss of or damage to property," explained:

> The word "or" typically indicates a disjunction or separation. [*Mich*] *Public Serv*[] *Co*[] *v City of Cheboygan*, 324 Mich 309, 341; 37 NW2d 116 (1949). As used here, the policy clearly requires "direct physical loss of property" or "direct physical damage to property." For purposes of resolving this appeal, we accept, without deciding, plaintiffs' contention that any such loss or damage need not be permanent. Nevertheless, the word "physical" necessarily requires the loss or damage to have some manner of tangible and measurable presence or effect in, on, or to the premises. [*Gavrilides*, ___ Mich App at ___; slip op at 7.]

In a footnote, the Court relied on the plain meanings of "physical" and "material":
The word "physical" "means of or pertaining to that which is material." *People v Yamat*, 475 Mich 49, 54 n 15; 714 NW2d 335 (2006) (quotation [marks] omitted). "Material means relating to, derived from, or consisting of matter and being of a physical or worldly nature." *Total Armored Car Serv*[]*, Inc v Dep't of Treasury*, 325 Mich App 403, 409; 926 NW2d 276 (2018) (quotation [marks] and alteration omitted). [*Gavrilides*, ___ Mich App at ___; slip op at 7 n 2.]

Here, there was no "direct physical loss of or damage to property, other than at the premises described in the Declarations" resulting from COVID-19.

Additionally, the policy provides coverage only when a civil authority "prohibits access to the premises[,]" not when a civil authority simply limits its use. Gourmet was never prohibited access to its space by the executive orders. In fact, it was only barred from "offering food or beverage for on-premises consumption[,]" and was "encouraged to offer food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service[.]" Executive Order 2020-9 did not prohibit Gourmet from accessing its space. On the contrary, relative to restaurants, Executive Order 2020-9 provided: "In offering food or beverage, a place of

-9-

public accommodation subject to this section may permit up to five members of the public at one time in the place of public accommodation for the purpose of picking up their food or beverage orders, so long as those individuals are at least six feet apart from one another while on premises." Gourmet's loss or limitation of its intended use—to offer in-person service to workers in the GMRC—is insufficient to rise to the level of prohibition required under the policy. There might have been a different result if this case involved a targeted shutdown order following a localized outbreak. For example, had a government order quarantined the city block or neighborhood around Gourmet's restaurant, preventing the public from accessing the location at all, this might have fallen within the civil authority coverage provision. Here, that was not the case. Essential employees or other potential customers could still access Gourmet for carry out under the executive orders.

Because there was no physical loss or damage to the areas surrounding Gourmet's space from COVID-19, nor was Gourmet prohibited from accessing its space by Executive Order 2020-9 and subsequent orders, it is not entitled to civil authority coverage. And because Gourmet is not entitled to coverage under either provision, the second question of whether an exclusion applies need not be addressed. *Drielick*, 496 Mich at 373.

## IV. CONCLUSION

For these reasons, we affirm the trial court's grant of summary disposition in favor of Farm Bureau.

/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro
/s/ Noah P. Hood

-10-